**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

PERRY STREET SOFTWARE, INC.,

                     Plaintiff,

     -against-

                                   No. 20-cv-04539 (CM)

JEDI TECHNOLOGIES, INC.

                     Defendant

_____

## ORDER AND DECISION GRANTING PERRY STREET'S MOTION FOR JUDGMENT ON THE PLEADINGS

McMahon, J.:

     Plaintiff Perry Street Software, Inc. originally sued defendant Jedi Technologies, Inc. seeking a declaratory judgment that Perry Street's "SCRUFF" dating app did not infringe on Jedi's '918 patent as a matter of law. Jedi has since counterclaimed against Perry Street for infringement. Perry Street now moves for a judgment on the pleadings, arguing that the '918 patent is ineligible for patent protection under 35 U.S.C. § 101 because it is directed at a non-patentable abstract idea, and that it does not otherwise recite an inventive concept that saves it from invalidation. _See Alice Corp. Pty. v. CLS Bank Int'l_, 573 U.S. 208 (2014).

     Perry Street's motion is granted.

     Although Perry Street invites the Court to decide this case on collateral estoppel grounds, the Court declines to do so, because it is not necessary to try to parse the differences between the patent-in-suit and certain predecessor patents that have already been invalidated, under _Alice,_ by another court. It is cleaner simply to decide this motion on the merits. The '918 patent is directed toward the abstract idea of automated matchmaking, and the patent's claimed five-step process for

matching compatible chatroom users does not contain any " 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id*. at 221 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 72 (2012)). This renders the '918 patent – just like the Jedi patents in prior litigation – ineligible for protection under § 101.

The patent is declared invalid, and Jedi's counterclaim for infringement is dismissed.

## I.      BACKGROUND

### A.      The Parties

Plaintiff Perry Street Software, Inc. ("Perry Street") is a company incorporated and headquartered in New York. Perry Street makes mobile apps, including SCRUFF and Jack'd, two online-dating apps that run on the iOS and Android platforms.

Defendant and counterclaimant Jedi Technologies, Inc. ("Jedi") is an Arizona-based corporation that holds Patent No. 10,164,918 (the "'918 patent") from the United States Patent and Trademark Office ("PTO").

Jedi, in a "lawyer's letter" sent on May 28, 2020, accused Perry Street's SCRUFF app of infringing the '918 patent. (Dkt. No. 21, Ex. C). Perry Street subsequently filed this lawsuit on June 12, 2020, asking the Court to hold, under the Declaratory Judgment Act and 35 U.S.C. § 1 *et seq.*, that its SCRUFF app did not infringe on the '918 patent as a matter of law. (Dkt. No. 6).

On August 7, 2020, Jedi filed a counterclaim against Perry Street, formally accusing it of patent infringement.

### B.      The Patent

Jedi's '918 patent is titled "System and Method for the Automated Notification of Compatibility Between Real-Time Network Participants." Its application was first filed on August

21, 2016 but claimed priority to a long line of patents dating all the way back to 2000. The PTO granted the patent on December 25, 2018. ('918 patent, Dkt. No. 78, Ex. 1).

The patent states that it "is related to computer Chat Room systems or similar network-based systems providing services to network users, specifically, the automated process of paging a chatter or other network participant." (*Id*. at 3:8–11). The patent is "directed to a new system designed to unite chatters for the purpose of creating new interpersonal relationships" and refers to the process described in its claims as an "Intelligence Driven Paging Process." (*Id*. at 5:62–65).

The patent contains four independent claims. Claim 1 is representative. It recites:

An improved method over traditional real-time internet-based communication networks for improving the ability for a participant to identify unknown yet compatible network participants to communicate in real-time where the network is configured to provide network services for at least 300,000 network participants and where at least a portion of the participants determined to be compatible use the network in real-time at random times, the improved method comprising:

**collecting** human participant-specific data for at least one participant of a real-time internet-based communication network having at least 300,000 network participants, wherein said step of collecting . . . data includes presenting to a human participant an on-line survey comprising a plurality of questions, and detecting and recording the human participant responses to the questions;

**storing**, in memory, the human participant specific data collected, wherein said step . . . includes creating at least one data table within a database that includes data for a plurality of human participants, and within said table storing at least one record containing information indicative of the human participant response to the questions;

**processing** the stored human participant specific data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants, wherein said step of processing . . . includes retrieving at least one compatibility criteria for the network participants . . . and applying the compatibility criteria to a plurality of network participant records . . . to determine the compatibility of the human participants;

**sorting** said human participant specific data from a plurality of network participants by interpersonal compatibility wherein sorting further includes

identifying participants who are logged into the network, providing the ability to identify compatible participants currently using the network; and

**directing** data for display in a window region of a graphical user-interface of a display device associated with a first compatible participant, including . . . by automatically directing for display only a portion of the human participant specific data of the first compatible participant to at least a second compatible participant . . . wherein the displayed human participant specific data includes an indication that said first participant is currently using said network.

The '918 patent asserts three other independent claims.

Claim 4:

A method for displaying a graphical user interface for increasing a real-time network participant's opportunities to identify and communicate, in real-time, with unknown yet interpersonally and geographically compatible participants of the network and improving the participant's usability of the network, where the unknown compatible participants interact with the real-time network at random times . . . .

Claim 6:

A method for the automated display of a prompt of unknown human participant-specific data of a compatible network participant engaged on a real-time network to a compatible network participant who is not engaged on the real-time network and increasing the opportunity to identify and communicate in the real-time network with a compatible participant . . . .

Claim 9:

A method for displaying a graphical user-interface for increasing a network participant's ability to identify other unknown but compatible network participants' availability to chat in a real-time network and improving usability of the network, where the network is configured to provide network services for at least 300,000 network participants and where at least a portion of the participants determined to be compatible use the network in real-time at random times . . . .

Significantly, the "method" mentioned in each of these three independent claims is essentially the same five-step process as described in Claim 1 – the collecting, storing, processing, and sorting of user data, before notifying users of a potential match.[1] (Dkt. No. 78, Ex. 1).

---

[1] The processes claimed by the other independent claims are as follows:

In its briefs, Jedi clarifies that the patent's claims are directed to improving "network chat systems, including improved user interfaces and other chatroom functionalities, and solve problems that exist only in network-based chatrooms with a large number (i.e., over 300,000) of participants." (Dkt. No. 80 at 10). For example, Jedi points out that, when chatrooms get crowded, it may be difficult, if not impossible to find compatible users with whom to chat. The '918 patent attempts to solve this problem.

- Claim 4:
  - **collecting** human participant specific data for a plurality of network participants, wherein said step of collecting human participant specific data includes presenting to the human participants at least one on-line survey comprising a plurality of questions and detecting and recording the human participants responses to the questions including whether the human participant has indicated a wireless device, capable of generating real-time positional information, as being associated with the human participant; **storing**, in memory, the human participant specific data collected . . . **processing** the stored human participant specific data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants . . . wherein interpersonal compatibility includes whether wireless devices are associated with each of the at least two network participants determined to be compatible; **determining** geographic compatibility between the at least two network participants previously determined to be interpersonally compatible . . . and automatically **directing** data for display in a window region of a graphical user-interface of the second wireless device, the data including a visual representation of the first compatible participant, an indication of the first compatible participant's immediate availability to chat, and an indication of the monitored location of the first wireless device.
- Claim 6:
  - **collecting** human participant-specific data for a plurality of network participants, wherein collecting human participant-specific data includes presenting to the human participants an on-line survey comprising a plurality of questions; **detecting** and recording the human participants responses to the questions; **storing**, in computer memory, the human participant specific data collected . . . **processing** the stored human participant-specific data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants, **sorting** said human participant-specific data from a plurality of network participants by interpersonal compatibility; **determining**, for a first participant, at a time when the first participant is engaged on the network, a desire to be introduced to at least one other participant determined to be compatible and displayed to the first participant; and **providing** improved functionality to participants by soliciting an auto-response prompt to the at least one other participant, at a time when the at least one other participant is not engaged on the network, wherein the auto-response, if selected, indicates a desire to view at least a portion of the first participant's collected data.
- Claim 9:
  - **collecting** human participant-specific data for at least one participant of a network having at least 300,000 network participants, wherein said step of collecting human participant-specific data includes presenting to a human participant an on-line survey comprising a plurality of questions . . . **storing**, in memory, the human participant specific data collected . . . **processing** the stored human participant specific data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants . . . automatically **sorting** said human participant specific data from a plurality of network participants by interpersonal compatibility, providing the ability to identify compatible participants, wherein sorting further includes identifying participants who are currently logged into the network to identify them as being available to chat; and **providing** improved functionality to participants by automatically directing data for display in a window region of a graphical user-interface of a display device in the  network . . . .

C.      **Jedi's Prior Patents and the Delaware Litigation**

This is not the first time that Jedi has been embroiled in litigation over its patents. In 2017, it sued several related companies (collectively "Spark") in the District of Delaware alleging infringement of four of the '918 patent's predecessor patents: U.S. Patent Nos. 7,885,977 (the "'977 patent"), 8,417,729 (the "'729 patent"), 8,930,406 (the "'406 patent"), and 9,432,315 (the "'315 patent"). The cases were assigned to The Honorable Gregory Sleet.

Spark moved to dismiss Jedi's infringement action under Fed. R. Civ. P. 12(b)(6), arguing that Jedi's four patents were directed at patent-ineligible subject matter under 35 U.S.C. § 101 – the same basis on which Perry Street now moves to dismiss this case.

All four of the patents-in-suit in the Delaware litigation were entitled "System and Method for the Automated Notification of Compatibility between Real-Time Network Participants" – the same name as the '918 patent. All four of the patents-in-suit in the Delaware litigation also contained claims similarly worded to the claims of the patent-in-suit in this litigation.

For example, Claim 1 of the '977 patent recited:

A method for automatically prompting compatible users of a network of their compatibility with at least another user, comprising:

> **collecting** user specific data and preferences for a plurality of network users, including presenting to the users at least one on-line survey comprising a plurality of questions and detecting and recording the users' responses to the questions . . .

> **storing**, in memory, at least a portion of the user specific data collected . . .

> **sorting** said user specific data . . . and . . .

> automatically **prompting** at least a portion of network users determined to have interpersonal compatibility and thereby indicating interpersonal compatibility between the users.

Claim 26 of the '729 patent:

A method for the automated display of human participant-specific data to a human participant of a real-time network, comprising:

> **collecting** human participant specific data for a plurality of network participants, wherein said step of collecting human participant-specific data includes presenting to the human participant an on-line survey comprising a plurality of questions . . .

> **storing**, in memory, the human participant specific data collected . . .

> **processing** the stored human participant specific data, using the compatibility criteria, to determine interpersonal compatibility between at least two network participants . . .

> **sorting** said human participant specific data from a plurality of network participants by interpersonal compatibility; and

> automatically **displaying** at least a portion of the sorted human participant specific data to at least one participant in association with the network, wherein the participant specific data includes a chat time a first participant is available to chat, and notifying compatible participants including prompting a compatible participant.

Claim 3 of the '406 patent:

A method for the automated display of human participant-specific data to a human participant of a real-time network, comprising:

> **collecting** human participant-specific data for a plurality of network participants, wherein collecting human participant-specific data includes presenting to the human participant an on-line survey comprising a plurality of questions . . .

> **storing**, in memory, the human participant-specific data collected,

> **processing** the stored human participant-specific data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants . . .

> **sorting** said human participant-specific data from a plurality of network participants by interpersonal compatibility; and electronically **displaying** an interaction from a first participant to at least a second participant determined to be compatible.

Claim 1 of the '315 patent:

7

A method for the automated display of human participant-specific data to a human participant of a real-time network, comprising the steps of:

> (a) **collecting** human participant specific data for a plurality of network participants, wherein said step of collecting human participant-specific data includes presenting to the human participant at least one on-line survey comprising a plurality of questions and detecting and recording the human participant responses to the questions . . .
>
> (b) **processing** the recorded human participant responses to the questions, to identify at least one facet of the human participant's personality;
>
> (c) **storing**, in memory, at least a portion of the human participant specific data collected . . .
>
> (d) **processing** the stored human participant specific data . . . to determine interpersonal compatibility between at least two network participants;
>
> (e) **sorting** said human participant specific data from a plurality of network participants by interpersonal compatibility . . . and
>
> (f) automatically **displaying** at least a portion of the sorted human participant specific data to at least one participant in association with the network including an indication of the relative position of the wireless device for at least one compatible participant.

In short, all of the independent claims analyzed by the Delaware court included essentially the same collecting, storing, processing, sorting, and notifying process described in the '918 patent.[2]

---

[2] The other independent claims reviewed by the Delaware court include:

- The '977 patent (Dkt. No. 78, Ex. 7):
  - Claim 4: A method for determining compatibility of at least two participants of a network based upon predetermined criteria and notifying the compatible participants, comprising: **collecting** human participant-specific data for a plurality of the participants, wherein collecting . . . includes accessing pre-existing data associated with a participant . . . **storing**, in memory, the human participant-specific data collected . . . **sorting** said human participant-specific data from a plurality of participants by participant-specified preferences; **processing** the stored human participant specific data, using at least the compatibility criteria and stored participant-specified preferences, to calculate interpersonal compatibility . . . automatically **determining** the compatibility of at least two participants using the calculated interpersonal compatibility, including assessing whether the participants are available to meet in person . . . and **notifying** compatible participants of their compatibility, including sending each compatible participant a message.
- The '729 patent (Dkt. No. 78, Ex. 6):
  - Claim 1: A method for determining compatibility of at least two participants of a network based upon predetermined criteria and notifying the compatible participants, comprising: **collecting** human participant-specific data for a plurality of the participants; **storing**, in memory, the human participant-specific data collected; **sorting** said human participant-specific data from a plurality of participants by compatibility criteria, . . . **processing** the stored human participant specific data, using the compatibility criteria to calculate interpersonal compatibility . . . and **notifying** at least one compatible participant of the compatibility.

On August 3, 2017, Judge Sleet dismissed Jedi's infringement suit in its entirety. He concluded that none of its four patents was eligible for protection under § 101, after analyzing each of the patents under the two-step process announced by the Supreme Court in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

The *Alice* inquiry first requires a court to "determine whether the claims at issue are directed to one of those patent-ineligible concepts" such as "laws of nature, natural phenomena, and abstract ideas." *Id*. at 217. If yes, a court must then determine whether the patent can be saved because it claims an " 'inventive concept' – *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*. at 217–18. (cleaned up).

At *Alice* step one, Judge Sleet found that all of the independent claims of each of the four patents were directed "to the abstract idea of matching people based on criteria such as personality traits or location." *Jedi Techs., Inc. v. Spark Networks, Inc.*, 2017 WL 3315279, at *7, *9–*10 (D. Del. Aug. 3, 2017). The patents' "foundation[s] rest[] upon the notion of human compatibility and matchmaking, where an individual learns about the personalities and interests of two different individuals and, based upon a certain criteria, determines whether the individuals are compatible." *Id*. at *7. Such a process was "certainly not novel and has been performed by humans for a very long time." *Ibid*. "Even if matchmakers traditionally have not relied on the Internet, the mere

---

- The '315 patent (Dkt. No. 78, Ex. 4):
  - Claim 6: A method for the automated display of human participant-specific data to a human participant of a real-time network, comprising: **collecting** human participant-specific data for a plurality of network participants, wherein collecting . . . includes presenting to the human participant an on-line survey comprising a plurality of questions . . . **storing**, in computer memory, the human participant specific data collected . . . **processing** the stored . . . data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants . . . **sorting** said human participant-specific data from a plurality of network participants by interpersonal compatibility . . . and automatically **displaying** at least a portion of the sorted human participant-specific data to at least one participant determined to be compatible . . . .

application of modern technology to the field of 'invention' does not somehow transform or otherwise change the character of the abstract idea." *Id*. at *8.

Proceeding to *Alice* step two, Judge Sleet found that not one of the four patents contained an inventive concept. Jedi had "contend[ed] that the asserted claims supply a solution to a problem specifically arising in computer networked online chat room implementations," *ibid*., and provided an "ordered combination" that solved problems inherent with how chatters interact with computer networks, *id*. at *9. But the court rejected these contentions, holding that the patents did "nothing more than 'recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.'" *Ibid*. (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014)). The fact that the patents described methods that automated a traditional process or slightly improved the efficiency of that process did not transform the abstract idea into an inventive concept. In Judge Sleet's words:

> The consolidation to a generic computer program of criteria such as astrological sign or geographic location are factors which have long been associated with determining dating compatibility in the pre–Internet world. Their inclusion does not solve a problem necessarily rooted in computer technology invented and designed to address the problem. The use of a generic computer to notify a chatter of matches recites what human matchmakers do in their profession—notify a customer that they have found a compatible individual.

*Ibid*. In short, the patents simply recited "generic configurations and conventional functionality . . . fail[ing] to impart any 'specific or limiting recitation of . . . improved computer technology' that satisf[ies] step two of *Alice*." *Ibid*. (citation omitted).

In sum, Judge Sleet found "by clear and convincing evidence that the asserted claims in the '977, '729, '406, and '315 patents are not eligible for patent protection under 35 U.S.C. § 101." *Id*. at *11. All four patents were declared invalid, and Spark's motion to dismiss was granted.

Jedi did not take an appeal from that decision.

10

D.     **The Instant Dispute**

On May 28, 2020, Jedi's counsel sent Perry Street a "lawyer's letter," accusing the SCRUFF app of infringement. (Dkt. No. 21, Ex. C). The letter asserted that there was "extensive use by Perry Street Software of the technologies described and claimed in the '918 patent in connection with Perry Street Software's SCRUFF service." (*Id*. at pg. 5). Although the letter noted that "Jedi's patents are battle-tested" and that "Jedi has engaged in numerous litigations since 2011 to protect its patented technologies in the online dating industry," (*Id*. at pg. 2), it also affirmed that Jedi's "sole objective is to initiate business discussions with Perry Street Software about obtaining rights under Jedi's patent portfolio and a possible business collaboration." (*Id*. at pg. 4).

Instead of negotiating, Perry Street commenced this action against Jedi on June 12, 2020, filing one claim that asked the Court to hold, under the Declaratory Judgment Act and 35 U.S.C. § 1 *et seq.*, that Perry Street's app did not infringe on the '918 patent as a matter of law. (Dkt. No. 6). Perry Street filed an amended complaint on July 24, adding a claim that the parties had to arbitrate their dispute because Jedi's lawyer had signed up for the SCRUFF app to investigate possible infringement, and thus must have agreed to be bound by the app's terms of service, which included a mandatory-arbitration provision. In deciding a motion for a preliminary injunction to stay the pending arbitration and a cross-motion to compel arbitration, the Court denied Perry Street's request to compel arbitration, in an order dated December 15, 2020. (Dkt. No. 66). *See Perry Street Software, Inc. v. Jedi Techs., Inc.*, No. 20-cv-4539 (CM), 2020 WL 7360470 (S.D.N.Y. Dec. 15, 2020); *Perry Street Software, Inc. v. Jedi Techs., Inc.*, No. 20-cv-4539 (CM), 2020 WL 6064158 (S.D.N.Y. Oct. 14, 2020).

Perry Street filed its motion for judgment on the pleadings on February 17, 2021.

## II.     DISCUSSION

### A.  Standard for a Motion on Judgment on the Pleadings

Although Perry Street is the plaintiff in this action, it is also the alleged infringer. It is moving for a judgment on the pleadings to dismiss Jedi's counterclaim alleging infringement and seeks a declaration that the '918 patent is ineligible for protection.

Federal Rule of Civil Procedure 12(c) provides that "After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001)). In an infringement action, "Patent eligibility may be determined on a Rule 12(c) motion, but only when there are no factual allegations that, if taken as true, prevent resolving the eligibility question as a matter of law." *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019). Yet even when accepting all of a patentee's allegations as true – as a court must do at this early stage of the litigation – "in many cases it is possible and proper to determine patent eligibility" on the pleadings. *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373–74 (Fed. Cir. 2016).

### B.  Collateral Estoppel

Perry Street suggests that Jedi is collaterally estopped from arguing that the subject matter of the '918 patent is not patent-ineligible, because another court has already determined that four of the '918 patent's predecessor patents – which claimed similar processes – were ineligible for protection under § 101.

"The doctrine of collateral estoppel, which is also known as issue preclusion, bars a party from re-litigating in a second proceeding a factual or legal or issue that has already been decided

against him in a prior proceeding." *Ferring B.V. v. Serenity Pharms., LLC*, 391 F. Supp. 3d 265,

281–82 (S.D.N.Y. 2019). The doctrine applies to preclude a party

> from relitigating an issue if a four-part test is met: (1) the identical issue was raised
> in a previous proceeding; (2) the issue was actually litigated and decided in the
> previous proceeding; (3) the party had a full and fair opportunity to litigate the
> issue; and (4) the resolution of the issue was necessary to support a valid and final
> judgment on the merits.

*Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). In cases under the appellate purview of

the Federal Circuit, that court "applies the law of the circuit in which the district court sits[.]"

*Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1345 (Fed. Cir. 2002).

The only real dispute on collateral estoppel is whether the "issue" of the patent-eligibility

of the '918 patent was at stake in the Delaware litigation. Obviously, Judge Sleet could not have

ruled on the validity of the '918 patent, since it was not one of the four patents at issue in that suit.

In fact, the patent had not yet issued at the time of the decision.

But the Federal Circuit's "precedent does not limit collateral estoppel to patent claims that

are identical. Rather, it is the identity of the issues that were litigated that determines whether

collateral estoppel should apply." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342

(Fed. Cir. 2013). Even if a patent contains different language from a previously invalidated patent,

an issue that has already been heard and decided cannot be re-litigated. "If the differences between

the unadjudicated patent claims and adjudicated patent claims do not materially alter the question

of invalidity, collateral estoppel applies." *Ibid*. Courts understand that "the claims of a patent may

be repeated and duplicated, varying one from the other only in minor details." *NetSoc, LLC v. Oath

Inc.*, No. 18-cv-12267 (RA), 2020 WL 419469 at *4 (S.D.N.Y. Jan. 24, 2020) (quoting *Bourns,

Inc. v. United States*, 537 F.2d 486, 491 (Fed. Cl. 1976)).

Collateral estoppel probably applies in this case. However, I prefer to decide the issue of patentability, rather than try to parse the similarities and differences among five patents.

"Courts have broad discretion to determine whether collateral estoppel applies." *Ferring*, 391 F. Supp. 3d at 282. This discretion is even greater when a plaintiff seeks to apply collateral estoppel "offensively" to preclude a defendant from relitigating "issues which the defendant previously litigated and lost against another plaintiff." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979). By deciding the case on the merits, rather than applying principles of former adjudication, there will be no doubt about the validity of the '918 patent, whereas it is possible that differences between the '918 patent and its predecessors could bar the application of collateral estoppel. And this particular patent is easy to invalidate.

### C. Alice

1. <u>Legal Standards</u>

35 U.S.C. § 101 states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). The Court has outlined a two-step test for determining eligibility.

At the first step, a court must "determine whether the claims at issue are directed to a patent-ineligible concept" such as an abstract idea. *Id.* at 217–18. In making this determination, a court should look at a patent claims' " 'character as a whole' rather than evaluating each claim limitation in a vacuum." *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir.

2020) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F. 3d 1327, 1335 (Fed. Cir. 2016)). The issue of whether a claim is directed to an ineligible subject matter is a matter of law, and a reviewing court is not bound by the determination of the PTO. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011); *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC* 958 F. 3d 1178, 1183 (Fed. Cir. 2020) ("[S]pecific details relating to the procedure of prosecution before the USPTO bear no relationship to the subject matter to which [a patent's claim] is directed.").

If the claim is not directed at a patent-ineligible concept, then the analysis ends, and any motion to dismiss based on *Alice* must be denied. *See Enfish*, 822 F.3d at 1339. But just because a patent's claims are directed to an abstract idea does not mean that it is *per se* invalid. Courts must still proceed to *Alice* step two.

At step two, a court must "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application. A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Alice*, 573 U.S. at 221 (cleaned up); *see also Mayo*, 566 U.S. at 77–78. A patent satisfies *Alice* step two if its claims "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.' " *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) (quoting *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014)). The question of whether the claims were "well-understood" in the industry is one of fact. *Ibid*. However, just like on any other motion to dismiss, a court need not accept a patentee's conclusory statements about its claims, and can properly rule on eligibility if there are no allegations that – when accepted as true – preclude

such a ruling. For example, automating or computerizing a common process is not an inventive concept. "Stating an abstract idea 'while adding the words 'apply it with a computer' . . . . cannot impart patent eligibility." *Alice*, 573 U.S. at 223.

2. Application

a. Alice *Step One: Is the Patent Directed at an Abstract Idea?*

The '918 patent's independent claims are clearly directed toward the abstract idea of finding and introducing individuals to others with whom they might be compatible; in other words, matchmaking – an idea that has existed for centuries, if not millennia. *See generally* Jane Austen, *Emma*, ch. 1 (1815) (the titular protagonist stating: "Ever since the day – about four years ago – that Miss Taylor and I met him [Mr. Weston] in Broadway Lane . . . I made up my mind on the subject. I planned the match from that hour.").

All four of the patent's independent claims purport to match individuals through the same process. First, the system "collect[s]" data from network users by "presenting . . . an on-line survey" of questions. After "storing" the data, it "process[es]" it "to determine interpersonal compatibility" by examining users' "compatibility criteria." The data is next "sort[ed] . . . by interpersonal compatibility" before users are automatically notified about a possible match by being displayed information about the purported match.

In none of these steps does the patent claim any innovative "compatibility criteria" that are distinct from traditional ones like making a match between two people based on their hobbies, interests, education, family background, or location. The patent also does not claim any new method for how the data is "sorted," nor does it propose a new method of matching individuals.

Taken as a whole, the patent claims do no more than "automate" a traditional process that has long been performed manually – helping people find someone with whom to enter a

relationship. Asking and answering questions to determine compatibility is not novel. It has been one of the primary ways that humans have attempted to find suitable partners for generations. *See generally* Henry James, *The American*, ch. 8 (1877) (the protagonist, Newman, when asked the "qualities that you require" in a woman, replies: "Goodness, beauty, intelligence, a fine education, personal elegance – everything, in a word, that makes a splendid woman").

Similarly, none of the patent's additional steps takes the patent outside of the sphere of traditional matchmaking. There is nothing novel about storing, processing, and sorting information to determine compatibility. Neither is the idea of notifying individuals when a possible match is found. *See id*. at ch. 3 (" 'Present to me a woman who comes up to my notions,' said Newman, 'and I will marry her tomorrow.' "). Indeed, these steps perfectly describe a process that "can be performed in the human mind, or by a human using pen and paper." *Ericsson*, 955 F.3d at 1327 (quoting *CyberSource*, 654 F.3d at 1372).

Jedi seeks to apply these age-old processes to the context of internet chatrooms. But facilitating human interactions or relationships – which could occur offline and without automation – is not a patent-eligible idea. It is, as Judge Sleet found in connection with Jedi's earlier patents, nothing more than the mechanization of traditional processes designed to satisfy humanity's desire for companionship. "[M]ere automation of manual processes using generic computers does not constitute a patentable improvement." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017). And a series of computerized steps is not eligible for protection if the steps "could all be performed by humans without a computer," *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016), because "the need to perform tasks automatically is not a unique technical problem," *Cellspin Software, Inc. v. Fitbit, Inc.*, 927 F.3d

1306, 1316 (Fed. Cir. 2019). Every step in Jedi's claimed process could be – and long has been – performed without any need for a computer.

Jedi insists that the character of its claims is directed towards improving display interfaces to make the chatroom/matching experience more enjoyable for users. It cites two cases in which courts have deemed "improved" or "new" user/display interfaces to be non-abstract, patentable ideas. *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1359 (Fed. Cir. 2018); *Match Grp. LLC v. Bumble Trading Inc.*, No. 6:18-cv-00080-ADA, Dkt. No. 46 (W.D. Tex. Dec. 18, 2018).

But in each of these cases, the court noted that the claims were directed toward the interface itself; to a "*particular manner* of summarizing and presenting information," not to a generalized process. *Core Wireless*, 880 F.3d at 1362 (emphasis added); *see also Match Grp.*, No. 6:18-cv-00080-ADA at 10 (noting that the "particular manner" of data presentation was a "stack of cards" and that users filter through dating bios by virtue of a specific "gesture" which was "swiping").

Here, the '918 patent's claims are not directed towards any "particular manner" of presenting information. The improved "interface" described in the claims is nothing more than the simple collecting, storing, processing, sorting, and displaying of information.

Jedi argues that the Court should construe the '918 patent's preamble language as claims limitations and should thus consider "improvements," such as how the patent could be used to identify compatible users "unknown" to one another beforehand, or others who tend to "log in and out of the system randomly." ('918 patent, Dkt. No. 78, Ex. 1 at 5:32; 6:34). But even accepting these preambular statements as claims limitations, *see Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002), the claims themselves and the steps outlined still do not recite anything unique or inventive in solving any network-based or

technological problem. Before the advent of computers or the internet, everything claimed by Jedi's system could be and was done by friends, family, or professional matchmakers, in "the old-fashioned way." The claims do not recite any "particular manner" for making the compatibility matches more quickly or accurately. Matching based on geographic location or whether someone is "available to chat" is not new. (*Id*. at 4:3, 4:26). There is also nothing special about identifying previously "unknown" partners. Any stranger is unknown until introduced. And "right person wrong time" is a complication of courtship that extends well beyond the '918 patent; it is certainly not a problem that the patent purports to uniquely solve. *See generally* Jane Austen, *Pride and Prejudice*, ch. 50 (1813) (Elizabeth opining that, "She was convinced that she could have been happy with him [Mr. Darcy], when it was no longer likely they should meet").

Jedi claims that the patent allows the network to notify offline users of individuals whom they might be interested in online. But this is no different than a matchmaker's notifying a person who is not actively looking for a partner or who was unaware of a potential match's existence.

In short, there are centuries-old ways of doing everything that the patent claims. The automation of those processes is insufficient to render the patent as directed at anything other than the abstract idea of matchmaking. The steps the '918 patent claims recite "longstanding conduct that existed well before the advent of computers and the Internet." *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017). Just applying these steps in the context of internet chatrooms is not an innovation eligible for patent protection, because "improving a user's experience while using a computer application is not, without more, sufficient to render the claims directed to an improvement in computer functionality." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020).

Jedi's nod to improved user interface is nothing more than the re-packaging of an "apply it with a computer" claim. That does not qualify a patent for protection under § 101.

Finally, this Court notes that the Federal Circuit recently invalidated two patents that were aimed at ideas extremely similar to those described in the claims of the '918 patent. In *NetSoc, LLC v. Match Grp., LLC*, 838 F. App'x 544 (Fed. Cir. 2020), the Federal Circuit considered claims for "establishing a social network" that consisted of "maintaining a list" of participants, "presenting a user with an interface from which the user makes a selection" from several different categories, and then "displaying, for the user, some of the information associated" with other users "which match the selection of the category by the [first] user" and "enabling the [first] user to send an inquiry message to one or more" of the other users to chat. *Id*. at 548. The Federal Circuit held that those claims were directed toward the establishment of a social network, which is an abstract idea "pertaining to methods of organizing human activity." *Id*. at 548 (quoting *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016)).

The '918 patent's claims similarly pertain "to methods of organizing human activity" such as " 'collecting data,' 'recognizing certain data within the collected data set,' and 'storing that recognized data in memory' " before using that data to achieve some end that could be done entirely without the internet. *TLI*, 823 F.3d at 613 (citation omitted). That Jedi asserts that the patent is limited to a specific context or a particular environment is of no moment and does not make the thrust of its claims any less abstract. *Ibid*.

Accordingly, the Court concludes that the patent is directed towards a patent-ineligible abstract idea under *Alice* step one.

*b.*   Alice *Step Two: Is There an Inventive Concept?*

The second step of *Alice* is "a search for an 'inventive concept' – *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18 (cleaned up). "The 'inventive concept' may arise in one or more of the individual claim limitations or in the ordered combination of the limitations." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).

But for a patent-ineligible concept to transform into an "inventive" one, the patent's claims must do more than computerize or automate a common process. "Wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Alice*, 573 U.S. at 223–24 (cleaned up). In other words, "after *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent eligible." *DDR Holdings*, 773 F.3d at 1256.

Jedi argues that it has pleaded factual allegations about the '918 patent that – when accepted as true – allows the complaint to survive any conceivable motion to dismiss. For example, it claims that the patent improves a chatter's user experience by automatically displaying the data of compatible users when the chatter is online, and by providing automatic notifications to offline chatters so that they are invited to return online to engage with new compatible users. (Dkt. No. 80 at 20). This, Jedi notes, "improves upon the manner and speed by which participants on a network establish relationships by providing ways to not only determine compatibility, but to display information including the availability of the compatible participants." (*Id*. at 21). It further

claims that the information displayed – such as a user's availability and his/her location – are innovative. (*Id.* at 17).

Jedi claims that these things were not "well-understood, routine, [or] conventional activities previously known to the industry." *Aatrix*, 882 F.3d at 1128 (citation omitted). Because the Federal Circuit has held that any consideration of whether a patent's claims were "well-understood," etc. are factual issues that must be accepted as true at the motion-to-dismiss stage, Jedi asserts that its complaint survives Perry Street's motion. *See Cellspin*, 927 F.3d at 1306; *Aatrix*, 882 F.3d at 1121; *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

But even accepting Jedi's allegations as true, the Court fails to see how the fundamental process claimed by the '918 patent is unique or adds an inventive concept. None of the steps the patent articulates is directed to a purely technological problem or one that plagues only internet chatrooms. Indeed, the problem Jedi describes – finding and starting compatible relationships when there are over 300,000 people looking for the same thing – is a problem not uncommon for anyone who has moved to a new city. And the process Jedi describes for solving that problem – the collecting, storing, sorting, processing, and displaying of information – is a process that has likely played out in the mind of every professional matchmaker or in the mind of a mutual friend of two people who have not yet met.

The specific inventive concept that Jedi relies upon – the ability to display the information collected to both online and offline users – "requires nothing more than 'off-the-shelf, conventional computer . . . and display technology for gathering, sending, and presenting the desired information.' " *Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 958 (quoting *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016)). Simply displaying compatible matches to users in different contexts is not an inventive concept because it is not a

technological improvement to anything fundamental about chatrooms or the internet. Automating a process is not enough to transform the stated process into a patentable idea if, "The claim limitations fail to add a *technological improvement* to the computer or otherwise provide 'something more' to 'transform' the claims." *NetSoc*, 838 F. App'x at 549 (quoting *Alice*, 573 U.S. at 221) (emphasis added). In *NetSoc*, the Federal Circuit held that, "Neither tracking a participant's response time nor using that response time to update a participant's rating represents a technological improvement that would render the claims non-abstract." *Ibid*. This is because these processes could all be conducted manually without the invention.

Here, there is nothing about the processes recited in the '918 patent that is directed at solving a purely technological issue. Instead, all the steps – including displaying the information automatically – can be performed manually without the invention. Telling someone of a potential match when they are "not seeking" or otherwise uninterested in dating is not new. Jedi's attempts to reframe this process does not take the patent outside of the "apply it with a computer" context. The Court sees the claims for what they are – an attempt to automate the matchmaking process.

In other words, Jedi does no "more than simply label [its] techniques as inventive." *Cellspin*, 927 F. 3d at 1318. The patent claims do not "recite a specific, plausibly inventive way of arranging devices and using protocols rather than the general idea of" automated matchmaking. *Id*. at 1319. As noted, Jedi does not describe any new steps to matchmaking, does not recite any new "compatibility criteria" nor any new way of "sorting" that criteria. Indeed, Jedi does not argue that it purports to do so.

Jedi also fails to identify why the steps themselves (the "ordered combination") that form the heart of its patent is an inventive concept. Just applying a series of steps that have clearly existed in other contexts to a new context (i.e., to internet chatrooms) does not transform the claims

into ones that are patent eligible. "A statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020). The Federal Circuit's "precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea." *Intellectual Ventures I LLC v. Capital one Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015).

The Court fails to see how any of Jedi's claims describe anything more than its five-step matchmaking process within the context of internet chatrooms. The patent's independent claims – its core "inventive" aspect – "do not require an arguably inventive device or technique for displaying information," nor do they "require an arguably inventive distribution of functionality within a network." *Elec. Power Grp.*, 830 F.3d at 1355. Instead, the steps "entail[] applying longstanding . . . practices using generic computer components and technology" to an arguably new context. *Ibid*. This does not transform the patent claim into one that is eligible for protection.

Finally, the situation here is distinguishable from the cases on which Jedi primarily relies in its briefs. In *Cellspin*, the Federal Circuit reversed the district court's ruling on *Alice* step two because the court "decided that it need not credit Cellspin's allegations" at the motion-to-dismiss stage – the district court erred by not evaluating the patent-at-issue's claims from the proper perspective. *Cellspin*, 927 F.3d at 1318. In contrast, the Court accepts Jedi's allegations as true. But that does not mean the *conclusion* Jedi puts forth – that the '918 patent claims an inventive concept eligible for protection – must be accepted as true. *See Ghaly Devices LLC v. Humor Rainbow, Inc.*, 443 F. Supp. 3d 421, 432–33 (S.D.N.Y. 2020) (in another matchmaking-esque patent dispute, holding that patentee's claims that displaying two users' degree of compatibility "in color" was not an inventive concept).

*Aartix* is also distinguishable. There, the Federal Circuit held that claims that are plausibly "directed to an improvement in the *computer technology itself* and not directed to generic components performing conventional activities" can generally survive a Rule 12(b)(6) motion to dismiss. *Aatrix*, 882 F.3d 1121, 1127 (Fed. Cir. 2018) (emphasis added). But again, Jedi's claims are not directed towards the computer technology itself. All it does is recite general steps for how individual users are matched or introduced, and just applies that process to internet chatrooms. As has now been noted, "apply it with a computer" claims are not patent eligible, and do not transform an otherwise ineligible patent into one that contains an "inventive concept" under *Alice* step two. The Court thus concludes that – even accepting all of Jedi's allegations as true – the '918 patent does not contain any discernible "inventive concept."

### III.   CONCLUSION

For the foregoing reasons, the Court concludes that the '918 patent's independent claims are directed towards the abstract idea of automated matchmaking and are thus ineligible for patent protection under § 101. The claims also do not include any inventive concept that otherwise transforms the claims into ones that are patent eligible.

Perry Street's motion for judgment on the pleadings is granted. The '918 patent is declared invalid, and Jedi's counterclaim for patent infringement is dismissed.

The Clerk of Court is respectfully directed to remove the motion at Docket Number 77 from the Court's list of open motions and to close this case.

Dated: July 13, 2021

_____

United States District Judge

BY ECF TO ALL COUNSEL